IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SIERRA G., on behalf of D.D.M., a minor,

Plaintiff,

v.

ANDREW M. SAUL,
Commissioner of Social Security,

Defendant.

Case No. 18 C 5615

Magistrate Judge Sunil R. Harjani

# MEMORANDUM OPINION AND ORDER

Plaintiff Sierra G.[1], on behalf of her son, D.D.M, seeks reversal or alternatively, a remand of the final decision of the Commissioner of Social Security denying D.D.M's application for Supplemental Security Income ("SSI"). The Commissioner asks the Court to affirm the denial of benefits. For the reasons that follow, the Court concludes that the ALJ's decision denying D.D.M.'s application was supported by substantial evidence. Accordingly, Sierra's Motion for Summary Judgment [12] is denied, and the Commissioner's Motion for Summary Judgment [18] is granted.

# BACKGROUND

On May 29, 2014, Sierra filed an application for SSI on behalf of D.D.M., alleging that D.D.M. had been disabled since he was born on April 7, 2014 due to left upper extremity brachial plexus injury and an inability to use his left arm.[2] D.D.M's father testified that he heard D.D.M's

---

[1]  Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff as "Sierra G." or "Sierra."

[2]  According to the Mayo Clinic, "the brachial plexus is the network of nerves that send signals from your spinal cord to your shoulder, arm, and hand. A brachial plexus injury occurs when these nerves are stretched, compressed, or in the most serious cases, ripped apart or torn away from the spinal cord . . .

left arm "snap" when he was delivered. (R. 51). On December 5, 2014, when he was almost eight months old, D.D.M. underwent left brachial plexus exploration and left intercostal to left ulnar nerve neurotization surgery. Approximately six months post-surgery on June 10, 2015, D.D.M. had significant improvement in terms of shoulder and bicep movement. *Id*. at 1423. He was able to lift his shoulder up to 90 degrees and flex his biceps but still had no movement in his left wrist and held it in a neural position. *Id*. In January 2017, D.D.M's pediatrician reported that he had decreased range of motion in his left arm, wore a splint at all times, and had no feeling from his left elbow down his arm through his hand. *Id*. at 1291. D.D.M. has full use of his right dominant hand.

D.D.M.'s application was initially denied on November 5, 2014 and upon reconsideration on July 9, 2015. (R. 62-93). Sierra then requested a hearing before an ALJ. *Id*. at 95-97. On January 3, 2017, Sierra and D.D.M's father appeared without an attorney and testified at a hearing before ALJ Jordan Garelick. *Id*. at 32-61. On August 23, 2017, the ALJ issued a decision denying D.D.M's application for SSI. *Id*. at 12-24. Applying the three step sequential evaluation process for evaluating whether a child is disabled, the ALJ found at step one that D.D.M. had not engaged in substantial gainful activity since the date of his application. *Id*. at 15. At step two, the ALJ found that D.D.M. has the following severe impairments: motor dysfunction, spinal cord or nerve root lesions, and spina bifida brachial plexus birth palsy with left arm involvement. *Id*. At step three, the ALJ determined that D.D.M. does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listed impairments. *Id*. The ALJ next determined that D.D.M. does not have an impairment or combination of impairments that functionally equals the severity of any listing. *Id*. at 15-24. In making the functional

---

Babies sometimes sustain brachial plexus injuries during birth." https://www.mayoclinic.org/diseases-conditions/brachial-plexus-injury/symptoms-causes/syc-20350235.

equivalence determination, the ALJ found that D.D.M. has a marked limitation in moving about and manipulating objects; less than a marked limitation in health and physical well-being; and no limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. *Id*. Based on these findings, the ALJ concluded that D.D.M has not been disabled since the date of his application. *Id*. at 24. The Appeals Council denied D.D.M's request for review on June 21, 2018. *Id*. at 1-6. D.D.M. now seeks judicial review of the ALJ's decision, which is the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 396 (7th Cir. 2019).

## DISCUSSION

Under the Social Security Act, a "child qualifies as disabled and therefore may be eligible for SSI if he has a 'medically determinable physical or mental impairment, which results in marked and severe functional limitations' and the impairment 'has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). When determining whether a child meets this definition, the ALJ applies a three-step sequential evaluation process: (1) has the child engaged in substantial gainful activity; (2) does the child have "a medically determinable impairment (or combination of impairments) that is 'severe'" and (3) does the severe impairment (or combination of impairments) meet, medically equal, or functionally equal the severity of a listing. *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1150 (7th Cir. 2019). To determine whether a child's impairment functionally equals a listing, "the ALJ considers six 'domains' of functioning: (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting with and relating to other people; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being." *Id*. at 1150-51. "Functional equivalence exists, and a child qualifies for benefits, if the ALJ finds a marked

3

difficulty in two domains of functioning or an extreme limitation in one." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007). A "marked" limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation occurs when the impairment very seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i).

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In reviewing an ALJ's decision, the Court may "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Sierra challenges two of the ALJ's findings. Sierra first contends that the ALJ should have found that D.D.M. has an extreme limitation in the domain of moving about and manipulating

4

objects. Second, Sierra argues that the ALJ should have found that D.D.M. experienced greater limitation than "less than marked" in the domain of health and physical well-being. Sierra does not object to the ALJ's findings that D.D.M. had no limitation in the other four domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. The Court concludes that substantial evidence the ALJ's findings that D.D.M. had a marked limitation in moving about and manipulating objects and less than a marked limitation in health and physical well-being.

### A. Moving About and Manipulating Objects

The ALJ determined that D.D.M. had a marked limitation in the domain of moving about and manipulating objects. Without citation to relevant case law or any medical evidence from the record, Sierra argues that the ALJ erred in failing to find that D.D.M. had an extreme—rather than merely marked—limitation in this area.

The domain of moving about and manipulating objects relates to a child's gross and fine motor skills. 20 C.F.R. § 416.926a(j). In this domain, the ALJ considers how a child moves his body from one place to another and how a child moves and manipulates things. *Id*. For newborns and young infants (birth to age 1), examples of typical functioning include: exploring immediate environment by moving body and using limbs, learning to hold head up, sit, crawl, and stand, trying to hold onto a stable object and stand actively for brief periods, and beginning to practice developing eye-hand control by reaching for objects or picking up small objects and dropping them into containers. SSR 09-6p, 2009 WL 396028 at *4 (Feb. 17, 2009). Older infants and toddlers (age 1 to age 3) should explore a wider area of the physical environment with steadily increasing body control and independence from others, begin to walk and run without assistance and climb with increasing skill, try frequently to manipulate small objects and to use hands to do or get

something wanted or needed, and use improving motor skills to play with small blocks, scribble with crayons, and feed self. *Id*. For children not yet three years old, an "extreme" limitation is demonstrated by "functioning at a level that is one-half of [one's] chronological age or less." 20 C.F.R. § 416.926a(e)(3)(ii).

The ALJ's determination that D.D.M. has a marked limitation in the domain of moving about and manipulating objects is supported by substantial evidence. In reaching this conclusion, the ALJ noted that despite his left brachial plexus injury, D.D.M was developmentally appropriate and meeting all milestones at 11 months old, including pulling to standing and taking a couple of steps with assistance. (R. 17, 1224); *see also id*. at 1176 (at nine months old, D.D.M's functional level was "age appropriate."). At one year old, D.D.M. was walking with good balance and his mobility was "age appropriate." *Id*. at 1257-58. At age 14 months and six months after his surgery, D.D.M. had improvement in terms of his left shoulder and bicep movement; he was able to lift his shoulder up to 90 degrees and flex his biceps. (R. 22; 1423). The ALJ acknowledged, however, that D.D.M still had significant left arm limitations as he was unable to move his left wrist and held it at a neutral position. *Id*. As the ALJ indicated, a complete review of all other systems was normal at that time. *Id*.

The ALJ also referenced the April 8, 2014 evaluation of Dr. Loris Rayner, D.D.M's pediatrician, when D.D.M. was two years old. (R. 22, 1303-06). The ALJ noted that D.D.M.'s general health was described as good, he had no sleep issues and no behavior issues, his mother expressed no concerns regarding his development, and he had normal gait and no coordination deficits. *Id*. at 22, 1303, 1305; *see also id.* at 1303 (at two years old, despite limited use of his left arm, D.D.M could color with crayons, put on clothes, wash and dry hands, turn single pages, stack five or more blocks, run well, walk up and down stairs, jump in place and balance on one foot).

The ALJ further noted that during a physical exam in August 2016 at age 2 years and 4 months, D.D.M. was active and playful. (R. 22, 1613). His spine was straight with no superficial signs of dysraphism and his gait was normal. *Id*. There were "no concerns" regarding D.D.M.'s gross motor skills. *Id*. at 1614. The ALJ noted that D.D.M. ambulated, squatted, returned to stance, and ran. (R. 22, 1614). In terms of fine motor ability, D.D.M. was still "not weight bearing much" with his left hand but used his right hand to hold a pen and scribble. *Id*. The ALJ observed that in January 2017, Dr. Rayner wrote that D.D.M. has decreased range of motion in his left arm, wears a splint at all times, and has no feeling from his left elbow down his arm and through his hand. (R. 22, 1291). The ALJ also pointed out that D.D.M. has full use of his right upper extremity. (R. 22). The ALJ acknowledged that in June 2016 and January 2017, it was noted that D.D.M. has posture abnormality. (R. 22, 1293, 1589). The ALJ indicated that as of January 4, 2017 and two years and eight months old, D.D.M's mobility was age appropriate and there were no concerns regarding his gross motor skills. (R. 22, 1681, 1683). The ALJ recognized that on February 7, 2017, D.D.M.'s visual motor integration was in the below average range, but his grasping skills were in the average range. (R. 22, 1696).

Further, the ALJ relied on the state agency physicians' opinions that D.D.M had a marked limitation in moving about and manipulating objects. (R. 17, 65, 76). Sierra does not challenge the ALJ's decision to give great weight to the opinions of the state agency physicians that D.D.M.'s brachial plexus provided a marked limitation in this domain, and she points to no contrary medical authority in the record. Lastly, the ALJ pointed out that at the hearing, D.D.M's parents testified that other than the lack of function in his left arm and hand, D.D.M. is otherwise mentally and physically healthy and has full use of his right arm for moving about and manipulating objects. (R. 16, 41-43, 53-54). In light of this evidence, the ALJ's conclusion that D.D.M. has a marked

limitation in the domain of moving about and manipulating objects is supported by substantial evidence.

Sierra's only argument regarding this domain is that D.D.M. "has lost all ability to manipulate objects with his left hand, [and] this is an extreme limitation." Doc. 12-1. Sierra does not cite, and the Court is not aware of, any authority supporting her position that D.D.M.'s deficits in his left upper extremity automatically equate to an extreme limitation in moving about and manipulating objects. Instead, the listings describe impairments that "cause marked and severe functional limitations" for children and are conclusively disabling. 20 C.F.R. § 416.925(a); *L.D.R. Wagner*, 920 F.3d at 1150 ("The listing in social security regulations specify the criteria for those impairments considered presumptively disabling."). As relevant here, Listings 111.07A and 111.08A require motor dysfunction meeting the requirements of 101.02 or 111.06, which apply to loss of function of "both upper extremities" and deficits involving "two extremities." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 111.06 and 101.02B referring to 101.00B2c; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 101.05 (a child is disabled when he has undergone amputation of "[b]oth hands."). The ALJ considered these two listings and found that the "evidence does not show complete loss of function, or disorganization of motor function in two extremities in the ability to stand up from a seated position, balance while standing or use of the upper extremities." (R. 15). Sierra does not allege that D.D.M.'s upper extremity condition met or medically equaled a listed impairment or otherwise challenge the ALJ's finding in this regard.

Moreover, courts have found that for adults, the inability to use one arm does not necessarily constitute an inability to perform work. *Jones v. Shalala*, 10 F.3d 522, 526 (7th Cir. 1993) ("Claimants with the use of one arm are not automatically entitled to disability benefits."); *Odle v. Secretary of Health and Human Services*, 788 F.2d 1158, 1161 (6th Cir. 1985) ("The loss,

8

or the loss of the use, of an arm or hand is not disabling per se."); *Robinson v. Celebrezze*, 326 F.2d 840, 841 (5th Cir. 1964) ("[I]t is common knowledge, that a man with only one arm or leg, if not otherwise incapacitated, may do much valuable work and engage in many gainful occupations."). Similarly here, D.D.M's inability to manipulate objects with his left hand does not automatically mandate a disability finding. The focus of the functional equivalent determination is the extent to which an impairment interferes with a child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). Here, the ALJ adequately complied with the regulations when he considered D.D.M's functioning as compared to other children his age without impairments. (R. 15, 17, 22); 20 C.F.R. § 416.926a(b). Beyond arguing that D.D.M is entitled to disability benefits solely because he is unable to manipulate objects with his left hand, Sierra has not provided any particular arguments as to how the ALJ erred in his consideration of the evidence in this domain. For example, Sierra has not pointed to any specific limitation from D.D.M.'s brachial plexus palsy that "interferes very seriously" with his ability to initiate, sustain, and complete age-appropriate activities in the domain of moving about and manipulating objects that the ALJ failed to consider. For these reasons, substantial evidence exists to support the ALJ's finding that D.D.M. has marked, and not extreme, limitations in the domain of moving about and manipulating objects.

### B. Health and Physical Well-Being

In the health and physical well-being domain, the ALJ considers "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies" on functioning that were not considered in the domain of moving about and manipulating objects. 20 C.F.R. § 416.926a(l). "[T]his domain does not address typical development and functioning," but instead "addresses how such things as recurrent illness, the side effects of medication, and the need

9

for ongoing treatment affect a child's body." S.S.R. 09-8p, 2009 WL 396030, at *2 (Feb. 17, 2009). Some examples of limitations in health and physical well-being that are provided in the regulations are: (i) generalized symptoms such as weakness, dizziness, agitation, lethargy, or psychomotor retardation; (ii) somatic complaints such as seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia; (iii) limitations in physical function because of treatment such as chemotherapy or multiple surgeries; (iv) exacerbations from one impairment or a combination of impairments that interfere with physical function; or (v) medical fragility and need for intensive care to maintain the level of health and physical well-being. 20 C.F.R. § 416.926a(l)(4)(i)-(iv).

Substantial evidence supports the ALJ's conclusion that D.D.M. has less than marked restrictions in the domain of health and physical well-being. First, the ALJ noted that at nine months old, D.D.M. sat well, crawled/creeped and pulled himself to his feet with support. (R. 23, 1339). His general health was described as good. *Id*. at 1339. Second, at eleven months old, D.D.M. was "[d]evelopmentally appropriate and meeting all milestones; pull[ed] to standing, [took] a couple steps with assistance." *Id*. at 1224. Third, at a year old, D.D.M. was "walking with good balance" and his function level was age appropriate. *Id*. at 17, 1258. Fourth, at 14 months old, a complete review of systems was normal except for D.D.M's left upper extremity condition. *Id*. at 17, 1423. Fifth, the ALJ noted that at two years old, D.D.M.'s general health was described as good. *Id*. at 23, 1303. He had no sleep issues, no behavior issues, and there were no concerns regarding his development. *Id*. at 23-24, 1303. D.D.M. had normal gait and no coordination deficits. *Id*. Sixth, at two years and four months old, D.D.M was observed to be active and playful, with normal gait and age appropriate speech. *Id*. at 17, 1612-13. Seventh, the ALJ pointed out that

D.D.M. has full use of his right upper extremity. *Id*. at 24. Eighth, the state agency physicians, to whom the ALJ assigned great weight, concluded that D.D.M. had less than marked limitations in the domain of health and physical well-being. *Id*. at 17, 66, 77. Ninth, D.D.M's parents testified that other than D.D.M's left upper extremity condition, D.D.M. is mentally and physically "stable" and "fine." *Id*. at 41, 53. Sierra added that D.D.M. "is pretty normal beside the left arm and hand not moving." *Id*. at 50. D.D.M's parents further testified that his right hand "work[s] well" and he "can do everything with the right hand." *Id*. at 48-49, 54. This evidence, which the ALJ cited in his decision, is substantial evidence supporting the ALJ's conclusion that D.D.M. is less than markedly limited in the domain of health and physical well-being.

Sierra's sole challenge to the ALJ's finding that D.D.M. had less than marked limitations in the health and physical well-being domain is that D.D.M's "continuous appointments and possible further surgical procedures [sh]ould be considered a marked limitation." *See* Doc. 12-1 at 2-3; doc. 20 at 3-4. In particular, Sierra testified that D.D.M. is "consumed" by doctor's appointments and a further surgery is planned for D.D.M's left arm when he is five years old. (R. 45, 53). Sierra further stated that the week before the hearing, D.D.M. had three doctor's appointments. *Id*. at 45; *see also* (R. 183) (Sierra reporting on March 12, 2015 that D.D.M. has "3-4 doctor and therapy appointments a week."). D.D.M's father testified that D.D.M. previously attended therapy twice a week, but at the time of the hearing, he was going to therapy once a week. *Id*. at 53. Finally, Sierra testified that she stopped working due to D.D.M's frequent doctors' and therapy appointments. *Id*. at 60-61.

Social Security Ruling 09-6p states that physical effects, "such as pain, weakness, dizziness, nausea, reduced stamina, or recurrent infections," may result from treatment. S.S.R. 09-6p, 2009 WL 396028, at *3. These physical effects can "determine whether a child feels well

enough and has sufficient energy to engage in age-appropriate activities, either alone or with other children." *Id*. "Therapy (for example chemotherapy, multiple surgeries or procedures, chelation, pulmonary cleansing, or nebulizer treatments) can have physical effects, including generalized symptoms, such as weakness, or more specific problems, such as nausea." SSR, 09-8p, 2009 WL 396030, at *2. "In addition, periods of therapy can be frequent or time-consuming, require recovery time, or reduce a child's endurance." *Id*.

Sierra's argument is not compelling because there is no evidence that the frequency of D.D.M. doctors' visits and therapy appointments afected his health and physical well-being. In assessing the domain of health and physical well-being, the ALJ considered that D.D.M. "receives on going care for his left upper extremity." (R. 24). The ALJ also noted that D.D.M. underwent surgery to treat his brachial plexus palsy condition at eight months old, which left him with numerous scars and in pain for over a month. (R. 16, 17, 22). D.D.M. has been subject to additional medical appointments and therapy with the possibility of further surgery at age five because of his left upper extremity condition. However, Sierra does not cite to any evidence indicating that the frequency of D.D.M's doctors' visits and therapy appointments have physical effects which limit his physical functioning. *See* 20 C.F.R. § 416.926a(l)(4)(iii) (An ALJ considers "limitations in your physical functioning because of your treatment."); *see also* SSR 09-8p, 2009 WL 396030, at *2 (noting that the domain of health and physical well-being addresses how the "need for ongoing treatment affect a child's body."). In fact, despite frequent doctors' visits and therapy appointments, D.D.M's pediatrician described D.D.M's overall general health as "good" at his nine-month and two-year-old well child exams. (R. 1303, 1339).

In *Carroll ex rel. Quinn v. Barnhart*, the district court held that substantial evidence supported the ALJ's finding of less than a marked restriction in the child's general health and

12

physical well-being due to a brachial plexus injury to the right arm where "plaintiff had surgery on her arm and required therapy, [but] was developing relatively normal in all respects." 2005 WL 1041337, at *4 (D. Kan. March 22, 2005). The *Carroll* court stated: "There is nothing in the record to suggest that plaintiff suffered any physical symptoms except those caused by her arm; she took no medications causing serious side effects nor was plaintiff required to report to the hospital for chemotherapy or other long-term involvement. Two surgeries prior to plaintiff's third birthday is not sufficiently frequent or disruptive to qualify under this listing." *Id*. Likewise, in this case, there is no evidence that D.D.M's frequent medical appointments and therapy related to his brachial plexus injury have left him with any symptoms such as pain, weakness, reduced stamina, or the inability to engage in age-appropriate activities. He has also not been hospitalized repeatedly or for significant periods. Given that Sierra has not shown a serious interference with D.D.M.'s ability to initiate, sustain, or complete activities due to the physical effects of his doctors' visits and therapy appointments, the ALJ's conclusion that D.D.M. did not have a marked limitation in this domain is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, Sierra's Motion for Summary Judgment [12] is denied, the Commissioner's Motion for Summary Judgment [18] is granted, and the ALJ's decision denying D.D.M's SSI application is affirmed.

**SO ORDERED.**

Dated: December 9, 2019

_____

Sunil R. Harjani
United States Magistrate Judge